| | | |
|---|---|---|
| Estado Libre Asociado de Puerto Rico<br>TRIBUNAL DE APELACIONES<br>PANEL ESPECIAL (X)<br>DJ 2024-062C | | |
| ARCHUD, PSC<br><br>Recurrente<br><br>v.<br><br>UNIVERSIDAD DE PUERTO RICO<br><br>Recurrida | TA2025RA00191 | REVISIÓN JUDICIAL procedente de la Universidad de Puerto Rico<br><br>Propuesta núm.: RFP DRO-25-011/11484 |

Panel integrado por su presidenta la juez Lebrón Nieves, la jueza Romero García y el juez Rivera Torres.

**Rivera Torres, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 20 de octubre de 2025.

Comparece ante este tribunal apelativo, Archud, PSC (Archud o parte recurrente) mediante el recurso de revisión de epígrafe solicitándonos que revoquemos la determinación de la *Tercera Notificación de Adjudicación* emitida y notificada el 15 de julio de 2025 por la Universidad de Puerto Rico (UPR o parte recurrida) en el Requerimiento de Propuestas RFP #DRO 25-011/11484 (*RFP o Request for Proposal*) para servicios de diseño programático y conceptual del edificio principal Guillermo Arbona Irizarry en el Recinto de Ciencias Médicas de la UPR. Mediante el referido dictamen, la UPR le otorgó la propuesta a Fiedler & Frías Arquitects, PC (Fiedler & Frías) y descalificó a Archud.

Por los fundamentos que expondremos a continuación, procede confirmar la *Tercera Notificación de Adjudicación* recurrida.

### I.

El 29 de octubre de 2024, la UPR publicó el *Requerimiento de Propuestas RFP #DRO 25-011/114849 para los servicios de diseño programático y conceptual del edificio principal Guillermo Arbona Irizarry en el Recinto de Ciencias Médicas de la Universidad de Puerto*

*Rico* (RFP o Request for Proposal).[1] Así las cosas, el 9 de diciembre de 2024, Archud presentó su propuesta por $773,460.[2] En esta, indicó que el presupuesto del proyecto provenía de fondos mixtos. Además, en su propuesta identificó a DCMC Partners (DCMC) como potencial subcontratista en carácter de consultor de cumplimiento respecto a la reglamentación de la Agencia Federal para el Manejo de Emergencias (FEMA, siglas en inglés). También, la parte recurrente divulgó que DCMC "[...] tenía relaciones contractuales con la Oficina Central de Recuperación, Reconstrucción y Resiliencia (COR3) y con el Departamento de Educación, subreceptor de fondos de recuperación de FEMA (al igual que lo sería la UPR bajo el proyecto). [...]".

Luego, el Comité Evaluador de la UPR consideró ocho (8) propuestas de proponentes cualificados, entre estas, a Archud. El ente administrativo examinó la relación de negocios entre Archud y los subcontratistas mencionados en su propuesta y expresó su preocupación, respecto a la participación de DCMC como subcontratista en la licitación, mientras tenía un contrato con el COR3. Sostuvo que, dicha relación contractual podía generar un conflicto de intereses. Durante dicho proceso de evaluación, COR3 confirmó relaciones contractuales vigentes entre su agencia y DCMC. Particularmente, COR3 explicó a la UPR, mediante correo electrónico con fecha de 24 de marzo de 2025, lo siguiente:

> [...] Por lo tanto, en caso de que exista algún conflicto, una opción sería que DCMC se retire completamente del proyecto. Además, la UPR debería revisar si la participación de DCMC pudo haber dado una ventaja injusta en la propuesta en la que figuran como subcontratistas. [...]".[3]

Al día siguiente, el Sr. Julio A. Collazo Rivera, Director la Oficina de Desarrollo Físico e Infraestructura (ODFI) de la UPR,

---

[1] Sistema Unificado de Manejo y Administración de Casos del Tribunal de Apelaciones (SUMAC TA), Entradas núm. 3 y núm. 4.
[2] SUMAC TA, Entradas núm. 6 y núm. 11.
[3] SUMAC TA, Entrada núm. 21.

dirigió una comunicación al Comité Evaluador en la que informó al organismo la descalificación de Archud.[4] Cónsono con lo anterior, el 26 de marzo de 2025, la UPR remitió una carta intitulada *Award Letter – RFP #DRO 25-011/*11484 en la cual le notificó a Fiedler & Frías que su propuesta había sido seleccionada.[5] A su vez, el 28 de marzo de 2025, la UPR notificó a Archud la adjudicación del RFP a Fiedler & Frías y el análisis para dicha selección.[6] Específicamente, indicó que durante el proceso de adjudicación hubo un hallazgo o apariencia de conflicto de interés.

Inconforme, el 4 de abril de 2025, Archud presentó *Reconsideration Request for Request For Proposal DRO 25-011/11484- New Building Programmatic and Design Concept Medical Sciences Principal Building Guillermo Arbona Irizarry, University of Puerto Rico.* En esencia, arguyó que obtuvo la puntuación más alta.[7] Además, manifestó que, la propuesta no fue descalificada inicialmente y, que la UPR debió comunicar una estrategia de mitigación sobre conflicto de interés según la Sección 15.2.5 del RFP.

Luego, el 25 de abril de 2025, el Comité Evaluador remitió a la UPR un documento en el cual denegó la solicitud de reconsideración de Archud y, concluyó que, la UPR no erró al descalificar a la firma Archud, y adjudicar la subasta a Fiedler & Frías.[8] A su vez, realizó las siguientes determinaciones de hechos:

1. El 9 de diciembre de 2024 se estableció la fecha de entrega de propuestas del RFP #DRO 25-011 para los servicios de diseño de programa para el proyecto 11484-DRO-010-24-RCM-New Building Programmatic and Design Concept for Medical Sciences Principal Building Guillermo Arbona Irizarry, University of Puerto Rico.

2. Doce (12) proponentes entregaron propuestas.

---

[4] SUMAC TA, Entrada núm. 22.
[5] SUMAC TA, Entrada núm. 23.
[6] SUMAC TA, Entrada núm. 24.
[7] SUMAC TA, Entrada núm. 25.
[8] SUMAC TA, Entrada núm. 26.

3. El Comité evaluador de propuestas de la UPR descalificó 4 propuestas, evaluando el resto de los proponentes (8).

4. Luego de varios incidentes procesales, mediante carta del 25 de febrero de 2025, el comité evaluador recomendó al Sr. Julio A. Collazo Rivera, Director de la Oficina de Desarrollo Físico e Infraestructura de la UPR, (ODFI) la contratación para el proyecto11484-DRO-010-24-RCM-New Building Programmatic and Design Concept for Medical Sciences Principal Building Guillermo Arbona Irizarry, University of Puerto Rico a la compañía ArchUD, PSC, representada por su presidente el arquitecto Javier Mirandés, por cantidad de $773,460.00 para el desarrollo del Diseño Programático Conceptual de este proyecto, Fases 1, 2, y 3.

5. No surge del expediente administrativo que el comité evaluador presentara señalamiento alguno o reparo con la propuesta de ArchUD.

6. Con fecha del 11 de marzo de 2025-ODFI envió correo electrónico a ArchUD solicitando confirmación de que DCMC formaba parte de su equipo de trabajo. A dicha solicitud ArchUD respondió que DCMC continuaba siendo parte de su grupo, que no habían enmendado su propuesta.

7. Mediante correo electrónico del 12 de marzo de 2025, la ODFI solicitó a ArchUD que describiera detalladamente qué tipo de relación de negocio tenía con la compañía DCMC y con todas las demás firmas o individuos que se mencionan en la propuesta RFP #DRO25-011 para el proyecto. ArchUD respondió que su relación con DCMC Partners y todas las demás firmas o individuos identificados en su propuesta es una de subcontratista (o subconsultores).

**8.** El 24 de marzo de 2025, mediante correo electrónico del Senior Project Manager de COR3, el señor Gabriel González Ramos, a la ODIF, le indicó que bajo el contrato vigente entre el COR3 y DCMC, **este último tuvo acceso, o estuvo expuesto, a información que podría otorgarle una ventaja competitiva sobre sus competidores. Además, según las disposiciones del contrato con COR3, DCMC está "obligada a actuar con total lealtad y sin intereses contrapuestos."**

9. El 28 de marzo de 2025 se notificó la carta de adjudicación por parte de la UPR. La misma establece que "…. Luego de considerar la evaluación y recomendación del Comité Evaluador designado para el RFP #DRO 25-011/ 06297 de servicios de diseño y supervisión - 11484-DRO-010-24-RCM-NEW BUILDING PROGRAMMATIC AND DESIGN CONCEPT FOR MED-ICAL SCIENCES PRINCIPAL BUILDING GUILLERMO ARBONA IRIZARRY, UNIVERSITY OF PUERTO RICO, la Oficina de Desarrollo Físico Infraestructura de la Universidad de Puerto Rico (ODFI) determinó seleccionar a la compañía FIEDLER & FRIAS ARCHITECTS, PSC por la cantidad total de $820,000.00".

10. El 4 de abril de 2025, ArchUD, PSC presentó solicitud de reconsideración a la UPR. (Énfasis nuestro)

En vista de las determinaciones de hechos antes formuladas, el Comité Evaluador resolvió que la participación de Archud con DCMC, como subcontratista, planteaba un conflicto de interés e infringía los requisitos de competencia justa y abierta establecidos en el 2 C.F.R. sec. 200.319. A su vez, esbozó que, dicha situación afectaba sustancialmente la legalidad y validez de la propuesta presentada, por lo que justificaba su descalificación del proceso de selección. Asimismo, apuntó que los argumentos esbozados en la solicitud de reconsideración estaban basados en normativa jurídica federal incorrecta, y que, las actuaciones de Archud ignoraban los principios de competencia justa que regían los procedimientos. Por todo lo anterior, razonó que, los argumentos de Archud carecían de pertinencia jurídica y no justificaban la alteración de la adjudicación previamente realizada.

Por otra parte, el Comité Evaluador adujo que, la propuesta no incluyó suficiente información con relación al potencial conflicto de interés entre DCMC y COR3. Ello, a los fines de poner a la UPR en posición para evaluar dicho conflicto. No obstante, señaló que, la UPR solicitó a Archud información adicional detallada de la participación de DCMC en su propuesta, pero su respuesta fue ambigua y sin especificidad suficiente que permitiera a la UPR confirmar o contradecir, el alegado conflicto con COR3. Apuntó que, Archud tampoco proveyó información adicional que refutara dicha alegación en su carta de reconsideración.

Por todo lo anterior, el Comité Evaluador resolvió que la UPR no debía asumir riesgo alguno con el desembolso de fondos federales. A su vez, explicó que la actuación de la ODIF al solicitar información del COR3, brindó la oportunidad a Archud para que proveyera información adicional sobre la relación de CDMC con ellos. Sostuvo que dicho proceder demostró la buena fe de la UPR y la falta de prejuicio o parcialidad en el proceso.

Conforme a lo anterior, el 30 de abril de 2025, la UPR denegó la solicitud de reconsideración presentada por la parte recurrente y la notificó ese mismo día.[9] Inconforme con el dictamen, el 20 de mayo de 2025, Archud presentó su recurso de *Revisión Judicial*, al cual se le asignó el alfanumérico KLRA202500288.[10] En este solicitó la revisión de la decisión de la ODFI de la UPR, con relación a la adjudicación del requerimiento de propuestas RFP notificada el 28 de marzo de 2025.

Atendido dicho recurso, el 4 de junio de 2025, este Panel emitió una *Sentencia* desestimando el recurso por falta de jurisdicción por su presentación prematura. Ello, toda vez que la notificación de la adjudicación del RFP y la reconsideración incumplieron con los requisitos de notificación y advertencia a la parte afectada, con relación a su derecho a presentar una revisión judicial.[11]

En cumplimiento con lo anterior, el 11 de junio de 2025, la UPR emitió *Award Letter – RFP #DRO 25-011 / 11484,* que se notificó al día siguiente.[12] Dicha notificación indicaba que el RFP fue adjudicado a Fiedler & Frías y que el monto de dicha propuesta era de $820,000. Finalmente, incluyó las advertencias correspondientes para solicitar reconsideración y revisión judicial. No obstante, el 20 de junio de 2025, Archud remitió una *Carta* en la cual manifestó que la notificación enmendada no fue remitida a su representante legal.[13] Además, señaló que dicha notificación no expresó los fundamentos para la adjudicación del RFP, limitándose a esbozar lo siguiente: "[*t*]*his decision was made after a comprehensive evaluation of all qualified proposals by an appointed Evaluation Committee*". Reiteró que, la notificación de adjudicación enmendada carecía de

---

[9] SUMAC TA, Entrada núm. 27.
[10] SUMAC TA, Entrada núm. 32.
[11] SUMAC TA, Entrada núm. 33.
[12] SUMAC TA, Entrada núm. 35.
[13] SUMAC TA, Entrada núm. 37.

efecto jurídico conforme a nuestro ordenamiento jurídico. Por último, solicitó la reconsideración del RFP.

Posteriormente, el 2 de julio de 2025, la UPR dejó sin efecto *Award Letter* del 11 de junio de 2025. A su vez, el 5 de julio de 2025, la UPR notificó el tercer *Award Letter* -RFP #DRO 25-011-11484 enmendado, que se notificó el 15 de julio de 2025.[14] El mismo constituye el dictamen recurrido. En este, reiteró que se adjudicó el RFP a Fiedler & Frías. De igual forma, incluyó una tabla con resultado promedio de rúbricas de las propuestas recibidas y las razones por las cuales las demás propuestas fueron recibidas y descalificadas. Respecto a Archud, indicó lo siguiente:

> 1. Archud, PSC - Durante el proceso de adjudicación la firma Archud, PSC fue descalificada por no cumplir con los requisitos establecidos en la sección 15.2 del RFP #DRO 25-011. En su propuesta, Archud, PSC incluyó como subcontratista a una firma de consultoría que ofrece servicios de asesoramiento/asistencia técnica a COR3, agencia que administra los fondos federales relacionados a los proyectos de recuperación del Huracán María. Este dato fue identificado por el Director de la ODFI tras la evaluación técnica del Comité Evaluador.
>
> **Esta firma participó activamente en gestiones directamente relacionadas con el proyecto objeto de este proceso, incluyendo reuniones de carácter técnico y colaborativo**.
>
> Ante este panorama, la UPR realizó una consulta a COR3 y un requerimiento de información a Archud, PSC (en adelante, "RFI") para conocer si el subcontratista seguía siendo parte de la propuesta y de los servicios a ser ofrecidos para el proyecto, y, además, para solicitar al proponente que describiese detalladamente qué tipo de negocio tendría con el subcontratista. Con esta información como base la UPR determinó la descalificación de Archud, PSC del proceso competitivo del RFP #DRO 25-011.
>
> La §200.319 del Título 2 del Código de Reglamentaciones Federales (en adelante, "CFR" por sus siglas en inglés) establece que los procesos de adquisición de servicios financiadas con fondos federales tienen que llevarse a cabo de manera que se garantice una competencia justa, abierta y que sea consistente con las normas establecidas en la citada

---

[14] SUMAC TA, Entrada núm. 40.

sección. (traducción nuestra). Además, la citada sección prohíbe prácticas que restrinjan la competencia, incluyendo aquellas en las que los "[c]ontratistas que desarrollen o redacten especificaciones, requisitos, declaraciones de trabajo o invitaciones para licitar o solicitudes de propuestas". (traducción nuestra). El 2 CFR §200.319 establece que estos deben ser excluidos de poder competir en el proceso de solicitudes de propuestas de dichas adquisiciones de servicios.

**La participación del subcontratista en gestiones directamente relacionadas con el proyecto objeto de este proceso, incluyendo reuniones de carácter técnico y colaborativo, y su acceso a información disponible al resto de los proponentes, constituye una violación directa a los principios de competencia abierta y justa**, ya que:

1. Ventaja competitiva injusta: La firma subcontratada por Archud, PSC tuvo acceso previo a datos privilegiados del proyecto 90632 Guillermo Arbona Irizarry, no disponibles para otros competidores, como el estado de los fondos del programa 406 y estrategias con FEMA.

2. Conflicto de interés organizacional: Según el 2 CFR §200.318(c) (1), los contratistas deben estar libres de conflictos de interés organizacionales que les impidan actuar con imparcialidad. La relación existente entre el subcontratista y COR3, combinada con su rol activo en el asesoramiento sobre el proyecto objeto del RFP, impide una competencia equitativa entre Archud, PSC y los demás proponentes.

3. Influencia sobre el contenido del proyecto: La intervención directa del subcontratista en las decisiones estratégicas sobre el proyecto y las gestiones ante FEMA plantea una posible injerencia en la elaboración de aspectos fundamentales del proyecto, lo cual es incompatible con su posterior participación como proponente.

4. Según el Boletín titulado "Conflicto de Interés", publicado por COR3, se ejemplifica un conflicto de interés cuando una persona forma parte de un panel de revisión de una subvención federal mientras trabaja simultáneamente para una firma de consultoría que también solicita fondos relacionados. Esta situación demuestra una doble función incompatible que afecta la imparcialidad del proceso. De manera análoga, en este caso, el subcontratista de la firma Archud, PSC participó activamente en gestiones previas directamente relacionadas con el proyecto objeto de este proceso, y posteriormente aparece como parte de una propuesta en respuesta al RFP #DRO 25-011 para ese mismo proyecto. Según el 2 CFR §200.319(b),

cualquier contratista que haya participado en el desarrollo de especificaciones, requisitos, declaraciones de trabajo o solicitudes de propuestas debe ser excluido del proceso competitivo, precisamente para evitar este tipo de conflicto organizacional.

5. [...]

Por lo tanto, **permitir la participación de Archud, PSC en este proceso de adquisición habría violentado las disposiciones y los principios de competencia plena, abierta y libre de conflictos establecidos y exigidos en el 2 CFR §200.319 y el 2 CFR §200.318(c) (1). comprometiendo la integridad del proceso y exponiendo a la UPR a riesgos de señalamientos de incumplimiento por parte de las entidades que administran estos fondos. La exclusión de este proponente garantiza la equidad del proceso y el cumplimiento con la normativa federal aplicable**. (Énfasis nuestro)

Así las cosas, el 15 de julio de 2025, Archud esbozó que recibió la notificación de la adjudicación enmendada del RFP.[15] Sin embargo, alegó que la adjudicación enmendada planteaba cuestiones de hechos que no surgían de los documentos que formaron parte del expediente administrativo, que la UPR produjo para su inspección el 8 de mayo de 2025, en la ODFI. En vista de ello, solicitó inspeccionar, de manera presencial, el expediente administrativo del RFP en o antes del viernes, 18 de julio de 2025.

Al día siguiente, Archud detalló que, acudió a la ODFI a los fines de inspeccionar el expediente administrativo del RFP. Resaltó que, durante dicha inspección, identificó varios documentos que no formaban parte del expediente administrativo en el que la UPR se basó al adjudicar el RFP, conforme a la producción del expediente que la UPR remitió por medios electrónicos el 2 de abril de 2025 y a los documentos que puso a su disposición para inspección y reproducción cuando visitó la ODFI el 9 de mayo de 2025. Sostuvo que los referidos documentos, los cuales la UPR pretendía añadir al expediente administrativo luego de haber adjudicado el RFP,

---

[15] SUMAC TA, Entrada núm. 42.

contenían texto que estaba parcialmente omitido o contenían enlaces web a otros documentos, a los cuales no se les brindó acceso pese a haberlo solicitado. Por ello, solicitó que se les brindara acceso a dichos documentos, a la grabación de la reunión que generó los documentos intitulados *Minuta Reunión*, y a la *Orden de Proceder –* Friedler & Frías que se emitió el 13 de mayo de 2025 para la Fase I del contrato Núm. 2025-DR0083. Particularmente, señaló que, los documentos producidos por primera vez, los cuales contenían enlaces web inservibles o que contenían texto parcialmente omitido eran los siguientes:

> 1. Documento titulado "Correo_COLLAZO, JULIO A. - Outlook COR3 Meeting.pdf". Documento que consta de tres folios en formato PDF, el cual tiene un sello que indica que fue impreso el 15 de julio de 2025 a las 8:15 am, contiene enlaces a reportes y documentos más completos que requieren la autorización de terceros para poder acceder a ellos.

> 2. Documento titulado "Correo_COLLAZO, JULIO A. - Outlook COR3 Meeting.pdf". Documento que consta de un solo folio en formato PDF, el cual tiene un sello que indica que fue impreso el 15 de julio de 2025 a las 8:16 am.

> 3. Documento titulado "Minuta Reunión 1 - Deep Dive.pdf". Documento que consta de un solo folio en formato PDF, el cual tiene un sello que indica que fue impreso el 14 de julio de 2025, a las 4:46 pm. El documento tiene varios enlaces que son inservibles.

> 4. Documento titulado "Minuta Reunión 2 - Recap.pdf". Documento que consta de un solo folio en formato PDF, el cual tiene un sello que indica que fue impreso el 14 de julio de 2025, a las 4:45 pm. Parte del texto al lado derecho del documento está omitido por quedar fuera de los márgenes de impresión. Otras partes están ocultadas por imágenes o solo son accesibles presionando enlaces que son inservibles.

> 5. Documento titulado "Minuta Reunión 3 - Transcript.pdf". Documento que consta de un solo folio en formato PDF, el cual tiene un sello que indica que fue impreso el 14 de julio de 2025, a las 4:46 pm. El documento parece ser una transcripción de una tele o videoconferencia generado por la aplicación Read.ai, pero solo contiene un folio de lo que presumiblemente es una transcripción de varias páginas.

6. Documento titulado "Screenshot 2025-07-15 at 8.18.33 AM.png". Documento que consta de un solo folio en formato de imagen .png, el cual, por su título, aparenta ser una captura de pantalla tomada el 15 de julio de 2025 a las 8:18 am. El documento contiene una imagen de un correo electrónico originado por Naitzabes Martínez de DCMC Partners con fecha de 25 de febrero de 2025, que a su vez contiene un enlace para una reunión por medio de Microsoft Teams. El documento contiene enlaces en las partes superior e inferior del documento, respectivamente, que leen "Ocultar historial de mensajes", pero no aparecen mensajes anteriores o posteriores a este.[16]

En respuesta, el 18 de julio de 2025, la UPR remitió una *Carta* a Archud en la cual explicó que lo solicitado requería producir información adicional que no era parte del expediente administrativo, otorgar acceso a un correo electrónico corporativo del Director de la UPR y, brindar información que pertenecía al COR3.[17] Añadió que, la opción de "*ocultar historial de mensajes*" que aparecía en la captura de pantalla del documento de 15 de julio de 2025, se refería a omitir el historial de dichos mensajes. No obstante, adujo que incluyó una captura de pantalla para observar la diferencia.

Luego, el 24 de julio de 2025, Archud remitió una *Carta* a la UPR.[18] En esta arguyó que, ni de la primera producción del expediente ni de la producción enmendada del expediente, surgía documento, información o evidencia de ninguna índole que pudiera sustentar las determinaciones de hechos de la notificación enmendada de la adjudicación del RFP. Aclaró que lo único que surgía de los documentos era un correo electrónico del COR3 de 24 de marzo de 2023, que indicaba que DCMC tuvo acceso o estuvo expuesto a información que lo pudiera poner en una ventaja competitiva sobre sus competidores y expresaba que, en caso de que existiera algún conflicto, una opción sería que DCMC se retirara

---

[16] SUMAC TA, Entrada núms. 43-48.
[17] SUMAC TA, Entrada núm. 51.
[18] SUMAC TA, Entrada núm. 53.

completamente del proyecto. Además, manifestó que la UPR tenía que analizar, si la participación de DCMC pudo haber otorgado una ventaja injusta en la propuesta en la que figuraban como subcontratistas.

Por otra parte, enfatizó que el correo electrónico del COR3 no concluyó que DCMC tuvo acceso a información que le confería una ventaja injusta a la propuesta de Archud, sino que invitaba a la UPR a revisar, si en efecto, había base para sustentar la existencia de un conflicto y le brindaba opciones para mitigar el potencial conflicto, si alguno. No obstante, esgrimió que, luego de recibir las recomendaciones del COR3, la UPR determinó descalificar a Archud sin investigar si, en efecto, este tuvo acceso a información confidencial que les confiriera una ventaja competitiva en el RFP.

Finalmente, esbozó que, el 16 de julio de 2025, identificó varios documentos que no formaban parte del expediente administrativo en el que la UPR se basó para adjudicar el RFP. Por ello, razonó que las determinaciones de hechos, en las que se fundamentaba la notificación de adjudicación enmendadas, eran falsas. Por otra parte, indicó que el Sr. Mark Merrit, principal oficial operacional de DCMC, no participó en la redacción de las especificaciones, términos y condiciones del RFP, y no tuvo acceso a información confidencial o privilegiada y/o pública sobre el RFP o sobre las fuentes de fondos para este, a los fines de conferirle una ventaja a Archud. En virtud de lo anterior, solicitó reconsideración de la notificación de adjudicación enmendada del RFP.

Luego de examinar los argumentos de las partes, el 3 de agosto de 2025, el Comité Evaluador emitió su *Determination on Request for Reconsideration – RFP #DRO 25-011 / 11484.*[19] En, esencia, mantuvo su determinación de descalificar a Archud

---

[19] SUMAC TA, Entrada núm. 55.

conforme a la Sección 15.25 del RFP. Sostuvo la UPR que tenía discreción para rechazar una propuesta siempre que actuara conforme al mejor interés de la institución. A su vez, resaltó que dicha determinación era conforme al RFP, en cumplimiento con su deber fiduciario al recibir fondos federales, con el propósito de salvaguardar la integridad en los procesos y asegurar el uso adecuado de los fondos federales.

Todavía insatisfecha, la parte recurrente presentó el recurso de revisión judicial que nos ocupa imputándole a la UPR haber incurrido en los siguientes errores:

> PRIMER ERROR: ERRÓ LA UPR AL DESCALIFICAR LA PROPUESTA DE ARCHUD BASÁNDOSE EN UN ALEGADO CONFLICTO DE INTERÉS ORGANIZACIONAL SOBRE EL CUAL NO EXISTE EVIDENCIA ALGUNA EN EL EXPEDIENTE ADMINISTRATIVO.
>
> SEGUNDO ERROR: ERRÓ LA UPR AL NO ABORDAR A ARCHUD PARA DARLE UNA OPORTUNIDAD DE EXPLICAR, MITIGAR O EVITAR EL ALEGADO CONFLICTO, SI ALGUNO, CONFORME A LAS DISPOSICIONES DEL RFP, DE LA REGLAMENTACIÓN FEDERAL Y DE LA RECOMENDACIÓN DE COR3.
>
> TERCER ERROR: ERRÓ LA UPR AL FUNDAMENTAR LA TERCERA NOTIFICACIÓN DE ADJUDICACIÓN DEL RFP EN DOCUMENTOS QUE NO FORMABAN PARTE DEL EXPEDIENTE ADMINISTRATIVO Y QUE NO FUERON PRODUCIDOS A ARCHUD.

El 28 de agosto de 2025, emitimos una *Resolución*, en la que entre otros dictámenes, concedimos a la UPR hasta el 15 de septiembre de 2025 para expresarse. Además, ordenamos a la parte recurrida a presentar copia certificada del expediente administrativo. Tras una solicitud de prórroga, el 19 de septiembre de 2025, la UPR presentó la copia certificada del expediente administrativo y presentó su *Alegato de la Parte Recurrida*[20], por lo

---

[20] Como parte de los anejos que acompañan el *Alegato de la Parte Recurrida*, la UPR incluyó el *Professional Services Agreement for Project Development and Hazard Mitigation Grant Program* suscrito el 1ro de julio de 2023 por DCMC y COR3 (Anejo A) y el *Memorando de COR3 a la UPR* del 18 de septiembre de 2025 (Anejo C). Nótese que, dichos documentos no formaron parte del expediente administrativo al momento de la presentación del recurso. Por tanto, los damos por no presentados.

que nos damos por cumplidos y a su vez, decretamos perfeccionado el recurso.

Analizados los escritos de las partes y el expediente apelativo; así como estudiado el derecho aplicable, procedemos a resolver.

**II.**

**El Mecanismo de *Request for Proposal* (RFP*)***

El procedimiento de pública subasta es uno de suma importancia y está revestido del más alto interés público en *pos* de promover la inversión adecuada, responsable y eficiente de los recursos del Estado. *Maranello, Inv. v. Oficina de Administración de los Tribunales*, 186 DPR 780, 793 (2012); *Autoridad de Carreteras y Transportación v. CD Builders, Inc.,* 177 DPR 398, 404 (2009); *Empresas Toledo v. Junta de Subastas*, 168 DPR 771, 778-779 (2006). Como la adjudicación de las subastas gubernamentales conlleva el desembolso de fondos del erario, "la consideración primordial al momento de determinar quién debe resultar favorecido en el proceso de adjudicación de subastas debe ser el interés público en proteger los fondos del pueblo de Puerto Rico." *Cordero Vélez v. Municipio de Guánica*, 170 DPR 237, 245 (2007). A su vez, las subastas gubernamentales tienen como objetivo el establecer un esquema que asegure la competencia equitativa entre los licitadores, evitar la corrupción y minimizar los riesgos de incumplimiento. *Aluma Constr. Corp. v. De Acueductos Alcantarillados*, 182 DPR 776, 783 (2011); A*utoridad de Carreteras y Transportación v. CD Builders, Inc.*, *supra*. Véanse, además, *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 DPR 864, 871 (1990); *Justiniano v. ELA,* 100 DPR 334, 338 (1971).

Por otro lado, aunque la subasta formal tradicional es el mecanismo más común para la adquisición competitiva de bienes y servicios por el gobierno, también se ha reconocido la figura del requerimiento de propuestas o *Request for Proposal* (RFP) como

mecanismo alterno informal para lograr dicho objetivo. Así pues, los requerimientos de propuestas son procesos, que al igual que las subastas formales, están basados en la libre competencia, pero son más informales y flexibles. Cónsono con lo anterior, el 26 de septiembre de 2012, nuestro alto foro dictó *Sentencia* en *Maranello et al. v. O.A.T*, 186 DPR 780 (2012). Si bien lo allí resuelto no constituye un precedente, en este se reitera el derecho aplicable al mecanismo de propuestas por lo que citamos a continuación las siguientes expresiones.

> Aunque la subasta formal es el método tradicional para regular la adquisición de bienes y servicios, se ha validado, como alternativa, la compra negociada y el mecanismo de requerimiento de propuestas o "Request for Proposal" (RFP) cuando se trata de bienes o servicios especializados que involucran aspectos altamente técnicos y complejos, o cuando existen escasos competidores cualificados. *Caribbean Communications v. Pol. de P.R.*, supra, pág. 996; *R&B Power v. E.L.A.*, 170 D.P.R. 606, 621-622 (2007).

> El mecanismo de propuestas se destaca por su mayor informalidad y flexibilidad, así como por el **grado de discreción** que se le confiere a la entidad pública en la consideración de la propuesta recibida, en comparación con la subasta tradicional. *R&B Power v. E.L.A.*, supra, pág. 623. Además, a diferencia del procedimiento formal de subasta, el RFP permite la compra negociada y confiere a los licitadores **la oportunidad de revisar y modificar sus ofertas antes de la adjudicación de la buena pro.** *Íd.*, a la pág. 621.

> Por otro lado, contrario al proceso de una subasta formal en el que se someten las propuestas selladas, el RFP **admite preguntas y sugerencias de parte de los licitadores para delinear una propuesta que se ajuste a las necesidades particulares de la agencia**. Se trata de un proceso de negociación entre la agencia y aquellos licitadores que cuentan **con mayor grado de conocimiento especializado en el servicio requerido**.

> Aunque el procedimiento de subasta formal y el requerimiento de propuestas son distintos, no son totalmente incompatibles. El *RFP*, por ser un mecanismo alterno al procedimiento tradicional, necesariamente participa de alguna de las características de la subasta formal. Específicamente, al igual que la subasta formal el requerimiento de propuestas está sujeto a los requisitos de notificación, así como los procedimientos de reconsideración y revisión judicial contenidos en la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 del 12 de agosto de 1988 (3 L.P.R.A. sec. 2101 *et seq.*). *Caribbean Communications v. Pol. de P.R.*, supra, pág. 998. [Énfasis nuestro]. *Íd.*, a las págs. 790-791.

**Code of Federal Regulations**

En lo pertinente a la controversia ante nuestra consideración, la Sección 200.318 del *Code of Federal Regulations*, expresa lo siguiente:

> (a) *Documented procurement procedures.* The recipient or subrecipient must maintain and use documented procedures for procurement transactions under a Federal award or subaward, including for acquisition of property or services. These documented procurement procedures must be consistent with State, local, and tribal laws and regulations and the standards identified in §§ 200.317 through 200.327.
>
> (b) *Oversight of contractors.* Recipients and subrecipients must maintain oversight to ensure that contractors perform in accordance with the terms, conditions, and specifications of their contracts or purchase orders. See also § 200.501(h).
>
> (c) Conflicts of interest.
>
> (1) The recipient or subrecipient must maintain written standards of conduct covering conflicts of interest and governing the actions of its employees engaged in the selection, award, and administration of contracts. No employee, officer, agent, or board member with a real or apparent conflict of interest may participate in the selection, award, or administration of a contract supported by the Federal award. A conflict of interest includes when the employee, officer, agent, or board member, any member of their immediate family, their partner, or an organization that employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from an entity considered for a contract. An employee, officer, agent, and board member of the recipient or subrecipient may neither solicit nor accept gratuities, favors, or anything of monetary value from contractors. However, the recipient or subrecipient may set standards for situations where the financial interest is not substantial or a gift is an unsolicited item of nominal value. The recipient's or subrecipient's standards of conduct must also provide for disciplinary actions to be applied for violations by its employees, officers, agents, or board members.
>
> (2) If the recipient or subrecipient has a parent, affiliate, or subsidiary organization that is not a State, local government, or Indian Tribe, the recipient or subrecipient must also maintain written standards of conduct covering organizational conflicts of interest. Organizational conflicts of interest mean that because of relationships with a parent company, affiliate, or subsidiary organization, the recipient or subrecipient is unable or appears to be unable to be impartial in conducting a procurement action involving a related organization.

A su vez, la Sección 200.319 del *Code of Federal Regulations*, expone lo siguiente:

> (a) All procurement transactions under the Federal award must be conducted in a manner that provides

full and open competition and is consistent with the standards of this section and § 200.320.

(b) **To ensure objective contractor performance and eliminate unfair competitive advantage, contractors that develop or draft specifications, requirements, statements of work, or invitations for bids must be excluded from competing on those procurements**.

(c) Examples of situations that may restrict competition include, but are not limited to:

(1) Placing unreasonable requirements on firms for them to qualify to do business;
(2) Requiring unnecessary experience and excessive bonding;
(3) Noncompetitive pricing practices between firms or between affiliated companies;
(4) Noncompetitive contracts to consultants that are on retainer contracts;
(5) Organizational conflicts of interest;
(6) Specifying only a "brand name" product instead of allowing "an equal" product to be offered and describing the performance or other relevant requirements of the procurement; and
(7) Any arbitrary action in the procurement process. (Énfasis Nuestro)

**Revisión judicial de las decisiones administrativas**

La revisión judicial de las decisiones administrativas tiene como fin primordial limitar la discreción de las agencias y asegurarse que estas desempeñen sus funciones conforme a la ley. *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 891-892 (2008). En el ámbito administrativo, los tribunales apelativos deben conceder una gran deferencia a las decisiones emitidas por las agencias debido a la vasta experiencia y conocimiento especializado en los asuntos que les han sido encomendados. *Buxó Santiago v. ELA et. als.*, 2024 TSPR 130, 215 DPR ___ (2024). *Specialty et al. II.*, 179 DPR 923, 940 (2010).[21]

No obstante, esta deferencia reconocida a las decisiones de las agencias administrativas habrá de ceder cuando: (1) la misma no esté basada en evidencia sustancial; (2) la agencia erró en la aplicación o interpretación de las leyes y el reglamento; (3) su

---

[21] Véanse, también, *Martínez v. Rosado*, 165 DPR 582, 589, (2005); *Otero v. Toyota*, 163 DPR 716, 727 (2003); *Transp. Sonell v. Jta. Subastas ACT*, 2024 TSPR 82, 214 DPR ___ (2024); *Otero Rivera v. USAA Fed. Savs. Bank*, 2024 TSPR 70, 214 DPR ___ (2024).

actuación resulte ser una arbitraria, irrazonable o ilegal, o (4) la actuación administrativa lesiona derechos constitucionales fundamentales. *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, 213 DPR 743 (2024). Por consiguiente, la revisión judicial de una decisión administrativa se circunscribe a analizar: (1) si el remedio concedido fue razonable; (2) si las determinaciones están sostenidas con evidencia sustancial; y (3) si erró la agencia al aplicar la ley. *Asoc. Fcias. v. Caribe Specialty et al. II, supra*, a la pág. 940.

En este ejercicio, nuestro más alto foro ha sido enfático en que las determinaciones de hechos de organismos y agencias públicas tienen a su favor una presunción de regularidad y corrección que debe ser respetada mientras la parte que las impugne no produzca suficiente evidencia para derrotarla. *Camacho Torres v. AAFET,* 168 DPR 66, 91 (2006). Quien las impugne tiene el deber insoslayable, para prevalecer, de presentar ante el foro judicial la evidencia necesaria que permita, como cuestión de derecho, descartar la presunción de corrección de la determinación administrativa. El peso de la prueba descansa entonces sobre la parte que impugna la determinación administrativa. *Íd.*

Como corolario a lo anterior, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAUG), Ley núm. 38-2017, 3 LPRA sec. 9675, dispone que las determinaciones de hechos realizadas, por una agencia administrativa, serán sostenidas por el tribunal revisor si se encuentran respaldadas por evidencia suficiente que surja del expediente administrativo al ser considerado en su totalidad. *Pacheco v. Estancias*, 160 DPR 409, 432 (2003). De modo que, la parte afectada, deberá reducir el valor de la evidencia impugnada o demostrar la existencia de otra prueba que sostenga que la actuación del ente administrativo no estuvo basada en evidencia sustancial. *Otero v. Toyota*, 163 DPR 716, 728 (2005). En

consecuencia, nuestra función se circunscribe a considerar si la determinación de la agencia es razonable, ya que se persigue evitar que el tribunal revisor sustituya el criterio de la agencia por el suyo. *Íd.*

Por otro lado, las conclusiones de derecho son revisables en toda su extensión. Sección 4.5, Ley núm. 38-2017, *supra*. Sin embargo, ello "no implica que los tribunales revisores tienen la libertad absoluta de descartar libremente las conclusiones e interpretaciones de la agencia." *Otero v. Toyota*, supra, a la pág. 729. Cuando un tribunal llega a un resultado distinto, este debe determinar si la divergencia es a consecuencia de un ejercicio razonable y fundamentado de la discreción administrativa, ya sea por la pericia, por consideraciones de política pública o en la apreciación de la prueba. *Íd.*

En conclusión, el tribunal solo podrá sustituir el criterio de la agencia por el propio cuando no pueda encontrar una base racional para explicar la determinación administrativa. *ECP Incorporated v. OCS,* 205 DPR 268, 282 (2020); *Hernández, Álvarez v. Centro Unido*, 168 DPR 592, 616 (2006), citando a *Otero v. Toyota*, supra.

### III.

En esencia, Archud planteó que la UPR erró al descalificar su propuesta basándose en un presunto conflicto de interés organizacional sobre el cual no existe evidencia alguna en el expediente administrativo. A su vez, en su segundo señalamiento de error, argumentó que la UPR erró al no brindarle a Archud la oportunidad de explicar, mitigar o evitar el presunto conflicto, si alguno, conforme a las disposiciones del RFP, la reglamentación federal y la recomendación del COR3. Finalmente, adujo que la UPR erró al fundamentar la tercera notificación de adjudicación del RFP en documentos que no formaban parte del expediente administrativo y que no fueron producidos a Archud.

Por estar estrechamente relacionados entre sí, discutiremos los señalamientos de error en conjunto. Surge del expediente ante nuestra consideración que, el 9 de diciembre de 2024, Archud presentó su propuesta. En lo pertinente, identificó a DCMC como potencial subcontratista en carácter de consultor de cumplimiento respecto a la reglamentación de la Agencia Federal FEMA. Además, la parte recurrente divulgó que DCMC tenía relaciones contractuales con el COR3 y el Departamento de Educación. Luego de evaluar las propuestas presentadas, el Comité Evaluador de la UPR examinó la relación de negocios entre Archud y los subcontratistas mencionados en su propuesta y, expresó su preocupación respecto a la participación de DCMC, como subcontratista en la licitación, mientras tenía un contrato con el COR3. Sostuvo que dicha relación contractual podía generar un conflicto de intereses.

Ante tal preocupación, el Comité Evaluador solicitó a Archud y a las compañías subcontratadas a explicar dicha relación jurídica. Durante dicho proceso de evaluación, el COR3 confirmó relaciones contractuales vigentes entre su agencia y DCMC. Particularmente, el 24 de marzo de 2025, el COR3 explicó a la UPR que, en caso de que existiera algún conflicto, DCMC podía retirarse del proyecto. Asimismo, añadió que la UPR debía revisar si la participación de DCMC pudo haber dado ventaja injusta en la propuesta en la que figuraban como subcontratistas. Al día siguiente, el director de la ODFI de la UPR notificó la descalificación de Archud.

Posteriormente, el 25 de abril de 2025, el Comité Evaluador emitió sus determinaciones de hechos. En lo pertinente, dicho Comité determinó que el Senior Project Manager del COR3, el Sr. Gabriel González Ramos, le indicó a la ODIF que, **bajo el contrato vigente entre el COR3 y DCMC, tuvo acceso, o estuvo expuesto, a información que podría otorgarle una ventaja competitiva sobre sus competidores**. Además, explicó que, según las

disposiciones del contrato con el COR3, DCMC está obligada a actuar con total lealtad y sin intereses contrapuestos.

Por otra parte, la Sección 15.2. del RFP dispone lo siguiente:

15.2 Conflict of Interest

15.2.1. Conflict of Interest: As defined by the "Organic Law of the Office of Government Ethics of Puerto Rico," Law No. 1 of January 3, 2012, as amended, a Conflict of Interest is a situation in which personal or economic interest is or may reasonably conflict with the public interest.

15.2.2. Interested proponents who are employees or contractors of the UPR are obligated to disclose their relationship with the University when confirming their interest in participating. For UPR employees, it is mandatory to notify and disclose the nature of the relationship and the campus where such a relationship exists. For contractors, it is mandatory to notify and disclose any active contracts with the University, including the campus or subsidiary corporations in which services are rendered, contract term, quantity, and registration number. This information will be analyzed on a case-by-case basis, in accordance with the "Organic Law of the Office of Government Ethics of Puerto Rico." Law No. 1 of January 3, 2012, as amended, and all applicable local, state, and federal laws and regulations. **The UPR will determine if the interested proponent will be disqualified for conflict of interest, or if a waiver from the Goverment Ethics Office will be sufficient to remediate said appearance of conflict of interest. If an interested proponent fails to provide accurate information, the UPR reserves the right to disqualify the proponent outright or cancel the award, if already granted.** (Énfasis nuestro).

15.2.3. No employee, officer, or agent may participate in the selection, award, or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest. The purpose of this prohibition is to ensure, at a minimum, that employees involved in the award and administration of contracts are free of undisclosed personal or organizational conflicts of interest-both in fact and appearance (2 C.F.R. § 200.318(c) (2).

15.2.4. **The Proponent shall notify the UPR as soon as possible if this contract or any aspect related to the anticipated work under this contract raises an actual or potential conflict of interest** (as defined at 2 C.F.R. Part 215 and 24 C.F.R. § 85.36 (2013) (or 84.42 (2013), if applicable). **The Proponent shall explain the actual or potential conflict in writing in sufficient detail so that the UPR can assess it**.

15.2.5. **In the event of real or apparent conflicts of interest, the UPR reserves the right, <u>in its best interest and at its sole discretion</u>, <u>to reject a proposal(s) outright or to impose additional conditions upon the Proponents</u>. The Proponent shall accept any reasonable conflict mitigation strategy employed by the UPR, including but not**

**limited to the use of an independent subcontractor(s) to perform the portion of work that gives rise to the actual or potential conflict. The UPR reserves the right to cancel any contract awarded pursuant to this RFP with 30 days' notice if an actual conflict of interest, or the appearance of such conflict, is not cured to UPR's satisfaction.**

15.2.5.1. A real conflict of interest arises when an employee, officer, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the aforementioned individuals, has a financial or other interest or a tangible personal benefit from a firm considered for a contract.

15.2.5.2. An apparent conflict of interest is an existing situation or relationship that creates the appearance that an employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract.

15.2.5.3. Although the term "financial interest" is not defined or otherwise described in the Uniform Rules, a financial interest can be considered to be the potential for gain or loss to the employee, officer, or agent, any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of these parties as a result of the particular procurement. The prohibited financial interest may arise from:

15.2.5.3.1. Ownership of certain financial instruments or investments like stock, bonds, or real Estate.

15.2.5.3.2. A salary, indebtedness, job offer, or similar interest that might be affected by the procurement.

Según el derecho previamente expuesto, los requerimientos de propuestas son procesos que, al igual que las subastas formales, están basados en la libre competencia, pero son más informales y flexibles. Cónsono con lo anterior, en *Maranello et al. v. O.A.T*, supra, el Tribunal Supremo expresó que, el mecanismo de propuestas se destaca por su mayor informalidad y flexibilidad; así como por el grado de discreción que se le confiere a la entidad pública en la consideración de la propuesta recibida, en comparación con la subasta tradicional. Además, a diferencia del procedimiento formal de subasta, el RFP confiere a los licitadores la oportunidad de revisar y modificar sus ofertas antes de la adjudicación de la buena pro.

Por otro lado, contrario al proceso de una subasta formal en el que se someten las propuestas selladas, el RFP admite preguntas y sugerencias de parte de los licitadores para delinear una propuesta que se ajuste a las necesidades particulares de la agencia.

Nótese que, al recibir la propuesta, la UPR brindó a Archud la oportunidad de aclarar dicha relación contractual. No obstante, únicamente se limitaron a indicar que tenían una relación con DCMC y el COR3, y que en el caso de que existiera un conflicto de intereses, era la UPR quien tenía que analizar si dicha relación contractual favorecía injustamente a Archud en el proceso de licitación. A su vez, el Sr. Gabriel González Ramos, le indicó a la ODIF que DCMC estuvo expuesto a información, durante la vigencia del contrato entre DCMC y COR3, lo que podría otorgarle una ventaja competitiva sobre sus competidores. Además, explicó que, según las disposiciones del contrato con el COR3, DCMC está obligada a actuar con total lealtad y sin intereses contrapuestos.[22] Por ello, es forzoso concluir que la UPR otorgó a Archud la oportunidad de explicar dicha relación contractual.

De igual forma, del expediente ante nuestra consideración, no surge que Archud presentó información adicional y convincente de que, en efecto, la relación contractual entre el COR3 y DCMC no presentaba un conflicto de intereses que le impidiera ser elegible en el proceso. No podemos olvidar que, el mecanismo de propuestas se destaca por su mayor informalidad y flexibilidad; así como por el grado de discreción que se le confiere a la entidad pública en la consideración de la propuesta recibida.

Enfatizamos, además, que la Sección 15.2.5. del RFP, establece que, ante la apariencia de un conflicto de interés, **la UPR tiene discreción para rechazar la propuesta o imponer**

---

[22] SUMAC TA, Apéndice 21, Entrada núm. 1.

**condiciones adicionales a la propuesta**. Por su parte, la Sección 15.2.2 explica que, si un licitador no presenta información precisa respecto al presunto conflicto de interés, la UPR tiene el derecho de descalificar o rechazar dicha propuesta. Por tanto, ante la escueta información que ofreció Archud, respecto al conflicto de interés, la UPR podía descalificar dicha propuesta.

Así pues, colegimos que, la UPR no erró al descalificar la propuesta de Archud, toda vez que, actuó bajo la discreción otorgada en el RFP y más aún, en su deber y responsabilidad inherentes de velar por la transparencia en la adjudicación del RFP; así como en la salvaguarda del buen uso de los fondos públicos.

De otra parte, el Apéndice B del RFP requería los siguientes documentos: *lobbying certification, non conflict of interest certification on existing or pending contracts* y un *limited denial of participation (LDP)/Suspension or Debarment Status Affidavit.*[23] A su vez, dicho documento advierte a los licitadores que, omitir la información solicitada, podía conllevar a su descalificación. En cumplimiento con lo anterior, el 5 de diciembre de 2024, Archud presentó los tres (3) documentos según requeridos en la RFP. Específicamente, en el *lobbying certification* notificó que, *no nonfederal funds have been used or are planned to be used for lobbying in connection with this application/award/contract.*[24] De igual forma, en el documento de *non conflict of interest* indicó que, *there are no relevant facts or circumstances that could give rise to an organizational or personal conflict of interest for the proposer or its staff with respect to the procurement process with the procuring entity. The proposer will disclose to the procuring entity any relevant information of an apparent, potential, or actual conflict of interest that may appear to*

---

[23] Expediente Administrativo, Expediente-UPR, Anejo 6 ARCHUD, PSC, A+UD PAYETTE Proposal, a las págs. 82-89.
[24] *Íd.*, a la pág. 82.

*exist regardless of their opinion that such information would not impair their objectivity.*[25] Nótese que, aunque Archud completó dichos documentos, no incluyó la información completa respecto al alcance de la relación contractual de DCMC. Por tanto, colegimos que Archud indujo a error a la UPR, al expresar en dichos documentos que no existía un conflicto de intereses.

En vista de todo lo anterior, resolvemos que el primer y segundo señalamiento de error, no se cometieron.

Finalmente, en su último señalamiento de error, Archud aduce que la UPR erró al fundamentar la tercera notificación de adjudicación del RFP en documentos que no formaban parte del expediente administrativo, y que no fueron producidos a Archud en las inspecciones del 2 de abril y 9 de mayo de 2025. Cabe precisar que dichos documentos no forman parte del expediente administrativo presentado por la UPR ante esta *Curia*. No obstante, Archud los incluyó como parte del apéndice del recurso.

Particularmente, el primer documento intitulado "Correo_COLLAZO, JULIO A. - Outlook COR3 Meeting.pdf." de 15 de julio de 2025 a las 8:15 am, es un correo electrónico que trata sobre una reunión respecto a las implicaciones de la propuesta de mitigación de FEMA y los pasos de planificación. En el segundo documento intitulado "Correo_COLLAZO, JULIO A. - Outlook COR3 Meeting.pdf." 15 de julio de 2025 a las 8:16 am, es un correo electrónico que no contiene ninguna información. El tercer documento intitulado "Minuta Reunión 1 - Deep Dive.pdf." de14 de julio de 2025 a las 4:46 pm, únicamente indica los participantes de dicha reunión. Respecto al cuarto documento titulado "Minuta Reunión 2 - Recap.pdf." del 14 de julio de 2025 a las 4:45 pm, en esta, se incluye un resumen de la reunión en la cual se discutieron

---

[25] *Íd., Non-Conflict of Interest Certification on Existing or Pending Contracts,* a las págs. 87-88.

las implicaciones de la propuesta de mitigación de FEMA, el valor del proyecto y la solicitud de subsidios.

El quinto documento intitulado "Minuta Reunión 3 - Transcript.pdf." del 14 de julio de 2025 a las 4:46 pm., refleja una comunicación entre el Sr. Mark Merritt y el Sr. Jeremy Blakey respecto a los fondos del proyecto. Finalmente, en el sexto documento intitulado "Screenshot 2025-07-15", la Sra. Naitzabes Martínez expresa que desea reunirse para analizar el proyecto y validar el curso a seguir del mismo.[26]

No olvidemos que, respecto a dichos documentos, el 18 de julio de 2025, la UPR remitió una *Carta* a Archud, en la cual explicó que lo solicitado requería producir información adicional **que no era parte del expediente administrativo**, otorgar acceso a un correo electrónico corporativo del Director de la UPR y, brindar información que pertenecía al COR3. A su vez, especificó que, la opción de "*ocultar historial de mensajes*" que aparecía en la captura de pantalla del documento de 15 de julio de 2025, se refería a omitir el historial de dichos mensajes.

Ahora bien, aun cuando dichos documentos no forman parte del expediente administrativo, entendemos que estos no afectan la determinación del Comité Evaluador de descalificar a Archud a base de la Sección 15.25 del RFP. Ello, pues dichos documentos no contienen información significativa que nos mueva a revocar o modificar la determinación de la UPR. Tampoco aportan prueba que resulten suficientes en derecho para rebatir las determinaciones de hechos emitidas por la agencia. Más bien los argumentos de Archud, respecto a este particular, no refutan lo determinado por la agencia ni justifican su proceder ante la ausencia u omisión de información sobre un potencial conflicto o posible ventaja sobre sus

---

[26] SUMAC TA, Entradas núms. 43-48.

competidores. Ello, a pesar de haber certificado que revelaría información relevante sobre, tan siquiera, la simple apariencia de un posible conflicto de interés. Enfatizamos que Archud era quién venía obligado a proveer la información sobre cualquier conflicto de interés real, potencial o aparente según se requería en los documentos e instrucciones del RFP, lo que no realizó.

Por tanto, reiteramos que la UPR no incidió al descalificar a Archud. Así pues, el tercer señalamiento de error no se cometió.

No podemos olvidar que, las decisiones de los organismos administrativos merecen la mayor deferencia judicial, pues son estos los que cuentan con el conocimiento experto de los asuntos que les son encomendados. En vista de lo anterior, concluimos que, la agencia no actuó de manera arbitraria, ilegal, irrazonable o fuera del marco de los poderes que se le delegaron.

**IV.**

Por los fundamentos antes expuestos, confirmamos la *Tercera Notificación de Adjudicación* (*Award Letter*-RFP #DRO 25-011-11484 enmendado) emitida y notificada el 15 de julio de 2025 por la Universidad de Puerto Rico.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones